# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1866 | **DATE** | 9/24/2002 |
| **CASE TITLE** | United States ex rel. GREGORY MADEJ vs. James M. Schomig, Warden | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons in the attached memorandum, Petitioner's Motion to Alter or Amend Judgment is Granted in part and Denied in part; Respondent's Motion to Reconsider is Granted; Petitioner's Motion to Strike Reply Brief Filed by Respondent in Support of Respondent's Motion for Reconsideration is Denied.  For the reasons given in this opinion and the original opinion, Petitioner's death sentence is vacated.  This opinion supplements the original opinion; to the extent the two opinions differ, the analysis in this opinion supersedes the original.  Any and all other pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 2 5 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 124 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | | courtroom deputy's initials | | |
| jar / LC | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | |
|---|---|
| United States ex rel. GREGORY MADEJ, A91848, | |
| **Plaintiffs,** | **No. 98 C 1866** |
| **v.** | |
| **JAMES M. SCHOMIG, Warden, Pontiac Correctional Center,** | **The Hon. David H. Coar** |
| **Defendant.** | |



## MEMORANDUM OPINION AND ORDER

This Court issued its original opinion granting, in part, the writ of habeas corpus on March 8, 2002. United States ex rel. Madej v. Gilmore, No. 98-C-1866, 2002 U.S. Dist. LEXIS 3807 (N.D. Ill. Mar. 8, 2002). Since that time, there have been three motions filed: the Petitioner filed a Motion to Alter or Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the Respondent filed a Motion to Reconsider, and the Petitioner filed a Motion to Strike Reply Brief Filed by Respondent in Support of Respondent's Motion for Reconsideration ("Motion to Strike"). The Court will address the motions in the opposite order from which they were filed.

### I. Petitioner's Motion to Strike

After the entering of judgment, Petitioner filed a timely Motion to Alter or Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. With Petitioner's Motion to Alter or Amend Judgment still pending, on May 28, 2002, the United States Supreme Court decided Bell v. Cone, --- U.S. --- , 122 S. Ct. 1843 (2002). In Bell v. Cone, the Court addressed when the respective rules of United States v. Cronic, 466 U.S. 648 (1984), and Strickland v. Washington, 466 U.S. 668 (1984), should apply to claimed violations of the Sixth Amendment right to counsel.

Nearly a month later, on June 22, 2002, the Respondent filed a "Motion to Reconsider" on the basis of the Supreme Court's recent decision in Bell v. Cone. The Petitioner filed a response, and the Respondent filed a reply brief. It was not until the reply brief that the Respondent presented a coherent position about the impact of Bell v. Cone on the judgment in this case. The Petitioner then moved to strike the Respondent's reply, as it raised and developed arguments not presented in the original pleading.

Petitioner's motion to strike has merit. Respondent's initial Motion to Reconsider presented a perfunctory argument that Bell v. Cone was relevant to the outcome of this case. Indeed, the full argument in the initial motion was to assert that the recent decision was "relevant and directly on point." (Resp't Mot. Recons. at 2.) Motions for reconsideration serve two limited purposes: (1) to correct legal or factual errors or (2) to present newly discovered evidence. See Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1269 (7th Cir. 1996) ("Motions for reconsideration serve a limited function: to correct manifest errors of law or fact, or to present newly discovered evidence.") (quoting Keene Corp. v. Int'l Fidelity Ins. Co., 561 F. Supp. 656, 665 (N.D. Ill. 1982)). Given the limited functions of the motion to reconsider, it is incumbent upon the party urging reconsideration to give thoughtful and thorough reasons supporting its request for the Court to reconsider its judgment. Respondent did not even attempt to explain the relevance of Bell v. Cone to the decision in this case until its reply brief. "In most circumstances, a litigant who fails to raise an argument until his reply brief will be deemed to have waived that argument." Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 439 (7th Cir. 1994) (citing Wilson v. O'Leary, 895 F.2d 378, 384 (7th Cir. 1990)). Like arguments presented initially in a reply brief, perfunctory arguments are also waived. United States v. Lanzotti, 205 F.3d 951, 957 (7th Cir. 2000) ("perfunctory and undeveloped arguments are waived").

The laws and procedures governing habeas corpus cases are admittedly complicated. See Hohn v. United States, 524 U.S. 236, 265 (1998) (Scalia, J., dissenting, joined by Rehnquist, C.J., Thomas and Kennedy, JJ.) (describing interpretation of habeas corpus statute as adding "new, Byzantine detail"); Coleman v. Thompson, 501 U.S. 722, 759 (Blackmun, J., dissenting, joined by Marshall and Brennan, JJ.) (describing habeas corpus jurisprudence as a "Byzantine morass"). Respondent is a frequent party to habeas corpus cases in this court, so it should be familiar with the pleading rules and procedures. See Fagan v. Washington, 942 F.2d 1155, 1157 (7th Cir. 1991) ("the lawyers employed by the state attorney general should be masters [in habeas corpus cases]."). Since this Court believes that the decision in Bell bears on this case, rather than granting the Petitioner's motion to strike, waiving Respondent's arguments, and processing a series of reiterated and substitute pleadings, in the interests of efficiency, the Court will proceed to address the issues directly. Respondent's slipshod pleading strategy will not delay further the disposition of Madej's habeas petition. The Respondent should be on notice, however, that the Court expects full compliance with pleading rules and procedures. Any similar violations in the future run the risk of having the pleadings stricken.

## II. Respondent's Motion to Reconsider

The sole issue in Respondent's Motion to Reconsider[1] is whether the intervening Supreme Court decision in Bell v. Cone should change the outcome of this case. Though the recent Supreme Court term was marked with watershed rulings affecting the death penalty, see Atkins v. Virginia, 122 S. Ct. 2242 (2002) (holding that executing mentally retarded offenders is cruel and unusual punishment in violation of the Eighth Amendment) and Ring v. Arizona, 122

---

[1]For the purposes of this opinion, the Court has treated Respondent's Motion to Reconsider as a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

S. Ct. 2428 (2002) (holding that the Sixth Amendment right to a jury trial requires juries, not judges, to sentence defendants in capital cases), history is unlikely to include Bell v. Cone in their ranks. This nearly unanimous opinion (8-1) merely clarified the required showing for a violation of the Sixth Amendment's right to counsel.

The Supreme Court first outlined the modern proof requirements for violations of the Sixth Amendment right to counsel in two 1984 opinions: Strickland v. Washington, 466 U.S. 668 (1984) and United States v. Cronic, 466 U.S. 648 (1984). Both cases shared the assumption that "the right to counsel is the right to effective assistance of counsel," McMann v. Richardson, 397 U.S. 759, 771 (1970), but they described different circumstances that would require the application of different legal rules. In Strickland, the Court held that most petitioners alleging a deprivation of their right to counsel required proof of two elements to prevail: deficient performance and prejudice. In short, they must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's substandard performance, the outcome would have been different. Strickland, 466 U.S. at 687. In Cronic, the Court held that the petitioner need not prove actual prejudice in the following three categories of circumstances: (1) when the petitioner was actually denied counsel at a critical stage of the proceedings; (2) when the petitioner's counsel "failed to subject the prosecution's case to meaningful adversarial testing," Cronic, 466 U.S. at 656; and (3) when the circumstances of the trial prevent counsel from affording effective representation. By its terms, Cronic describes rare exceptions to the rule of Strickland, and courts have applied it "very sparingly." Toomey v. Bunnell, 898 F.2d 741, 744 n.2 (9th Cir. 1990).

In Bell v. Cone, the Court was addressing a claimed violation of the Sixth Amendment right to counsel during the sentencing hearing of a death penalty case. During Mr. Cone's

sentencing hearing, his defense attorney did not attempt to mitigate the sentence with evidence, nor did he make any closing argument to the jury. The Sixth Circuit below held that those failures were so grievous that they did not require a showing of actual prejudice, applying the second of Cronic's three exceptions to the Strickland rule. See Cone v. Bell, 243 F.3d 961, 979 (6th Cir. 2001) ("Essentially, Cone did not have counsel during the sentencing phase of his trial and thus the prosecutor's insistence that justice required that Cone be put to death was not subjected to 'meaningful adversarial testing.' Cronic, 466 U.S. at 656."), rev'd, Bell v. Cone, 122 S. Ct. 1843 (2002). The Supreme Court reversed that decision, holding that trial counsel didn't entirely fail— he only failed at "specific points." Bell v. Cone, 122 S. Ct. 1843, 1851 (2002). The Court announced that in order to apply the second exception of United States v. Cronic, "the attorney's failure must be complete." Bell v. Cone, 122 S. Ct. at 1851. The difference between the rules of Strickland and Cronic, is "not of degree [of ineffectiveness] but of kind." Id.

Bell v. Cone, then, defines more clearly the type of lawyering that will fall into Cronic's second category. As the Eleventh Circuit recently noted, after Bell v. Cone, the "standard is extremely high for a petitioner asserting that his counsel entirely failed to subject the prosecution's case to meaningful adversarial testing." Hunter v. Moore, No. 00 14576, 2002 WL 2013266, at *2 n.4 (11th Cir. Sept. 4, 2002) (discussing Bell v. Cone).[2] In order to apply a presumption of prejudice when counsel fails to subject the prosecution's case to meaningful

---

[2]Bell v. Cone does not appear to alter the conditions for presuming prejudice under Cronic when a defendant is actually denied counsel at a critical stage of the proceedings or when the circumstances of the trial render effective assistance impossible. Accord Hunter v. Moore, No. 00–14576, 2002 WL 2013266, at *2 n.4 (11th Cir. Sept. 4, 2002) ("The court in Bell[v. Cone] did not appear to modify the analysis for a petitioner claiming that he was denied counsel at a critical stage in the trial.").

adversarial testing, counsel's performance must move beyond patent ineffectiveness into rank incoherence.

In the case before the Court, Petitioner's trial counsel's failures during the sentencing hearing were egregious. After Bell v. Cone, though, it does not seem that those failures were sufficient to meet the standard of "complete failure" necessary to apply a presumption of prejudice. See Haynes v. Cain, 298 F.3d 375, 381 (5th Cir. 2002) ("[D]efense counsel must *entirely* fail to subject the prosecution's case to adversarial testing for the Cronic exception to apply.").

This brings the Court to assess whether the Petitioner was prejudiced by counsel's deficient performance. This determination does not begin on a clean slate. This Court previously held that counsel's failure to investigate, develop, and present any mitigating evidence to the trial judge was sufficiently prejudicial to grant relief. (Slip op. at 9–11, 12–13). Since that original ruling was based, in the alternative, on the Cronic rule of presumed prejudice, the Court will expand on the prejudice analysis here.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), federal habeas courts cannot grant relief unless the prior state court adjudication of the claim "resulted in a decision that was [either] contrary to, or involved an unreasonable application of clearly established federal law [or] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

The Illinois Supreme Court applied the Strickland two-part test to Madej's ineffective assistance of counsel claim. The state supreme court had no difficulty determining that Madej's attorney's performance was objectively unreasonable: "counsel's decision not to investigate was neither the product of an informed judgment nor a strategic decision reached after weighing all

available options." People v. Madej [Madej II], 685 N.E.2d 908, 918 (Ill. 1997). The state court continued: "It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness." Madej II, 685 N.E.2d at 919 (quoting Blake v. Kemp, 758 F.2d 523, 533 (11th Cir. 1985)).

After finding that Madej's trial counsel failed altogether to prepare any mitigation presentation, the state court decided that Madej had not proved prejudice. The state court looked at the extensive mitigating evidence that Madej's post-conviction counsel had presented and dismissed it all because it was not "inherently mitigating." Madej II, 685 N.E.2d at 920. It viewed Madej's history of substance abuse as "a double-edged sword at the aggravation/ mitigation phase of the penalty hearing." Id. at 919. The court held that Madej's impaired neurological function was "not inherently mitigating." Id. at 920. About Madej's childhood, wherein he was subjected to extreme physical abuse and was forced to witness his father's regular violent outbursts against his mother, the state court decided that the trial court "was free to conclude 'that it simply had no mitigating value but may have been, in fact, aggravating.'" Id. at 920 (quoting People v. Ward, 609 N.E.2d 252, 280 (Ill. 1992).

The state court's prejudice analysis assumes that the mitigating evidence was actually presented to the sentencing body during the trial; it was not. The state court then tries to mask the deficiency with citation of cases where the mitigation evidence was actually presented to the sentencing body. See People v. Ward, 609 N.E.2d 252, 280 (Ill. 1992) ("[T]he trial judge admitted this evidence, considered what it revealed about defendant, and concluded that it simply had no mitigating value but may have been, in fact, actually aggravating.") cited in Madej II, 685 N.E.2d at 920; see also People v. Pulliam, 680 N.E.2d 343 (1997) (direct appeal case) cited in

<u>Madej II</u>, 685 N.E.2d at 920; <u>People v. Shatner</u>, 673 N.E.2d 258 (1996) (direct appeal case) <u>cited in Madej II</u>, 685 N.E.2d at 919. This represents an "unreasonable application of clearly established federal law."[3]

Here, the state court essentially deferred to the lawyer's non-existent "decision" not to present this mitigating evidence because it *might not* have helped. By the same token, if it *might* have helped, then Petitioner begins to discharge his burden of proving prejudice. The Supreme Court has held that a petitioner alleging ineffective assistance of counsel must show that counsel's errors had more than "some conceivable effect on the outcome of the proceeding," <u>Williams v. Taylor</u>, 529 U.S. 362, 394 (2000), but a petitioner is *not* required to show that "counsel's deficient conduct more likely than not altered the outcome in the case." <u>Strickland</u>, 466 U.S. at 693. <u>Strickland</u> requires the reviewing court to evaluate counsel's alleged failures against what actually happened at the original trial. The reviewing court should not dismiss various categories of mitigating evidence individually; rather, it must take the mitigating evidence that effective counsel would have discovered and ask whether there is a reasonable probability that, if the proceeding had included this evidence, the outcome would have been different.

---

[3] The original state court opinion was contrary to clearly established federal law, as it clearly applied an outcome-determinative standard. It originally required the defendant to establish "that the outcome of his sentencing hearing would have been different if his attorney had investigated and prepared more adequately for the [sentencing] phase of the trial." (App. to Reply Mem. of Law in Resp. to Resp't's Corrected Answer and in Supp. Am. Pet. for Writ of Habeas Corpus - Ex. B at 15) After Madej filed a petition for rehearing, based in part on the application of the wrong legal standard, the state court issued a corrected opinion. The corrected opinion, through hand-written changes, reflected the correct legal rule. Although the Court recognizes some impropriety in issuing a handwritten correction *after* the petitioner has filed for rehearing that incorporates one of the issues in the petition for rehearing, the final state court opinion nevertheless did utilize the correct legal rule.

The mitigating evidence uncovered by post-conviction counsel is compelling. Had counsel performed any investigation into petitioner's background, he would have readily uncovered extensive evidence of Madej's abusive childhood. His father physically abused him regularly, hitting him with a shovel or a tire chain on some occasions. When petitioner's father was not beating petitioner, he was beating petitioner's mother. Madej's mother was willing to testify about the physical abuse she endured, the physical abuse her son endured, and the damaging effects that had on his development. She also would have testified about his courageous efforts to defend her from her husband. Her testimony was not presented due to trial counsel's failure to investigate.

The sentencing body also would have heard a plea for mercy from the victim's surviving husband. Victim-testimony is often extremely compelling when it is presented in sentencing hearings, and the Supreme Court has held that it is relevant to the determination of sentence. See Payne v. Tennessee, 501 U.S. 808, 827 (1991). This testimony increases the likelihood that the outcome of petitioner's sentencing hearing would have been different if he had received constitutionally effective assistance of counsel.

Counsel also failed to develop evidence of petitioner's neurological impairments resulting from his years of poly-substance abuse. While the sentencer would have been free to discount such evidence had it been presented, it was not presented at trial, so it must be considered alongside the other proffered mitigation evidence that counsel failed to investigate, develop, or present.

In addition to his absolute failure to prepare for the sentencing phase, this court reiterates its original finding that petitioner's counsel failed to inform him of the jury unanimity requirement to impose a death sentence. (Slip op. at 13) While this fact alone would be

insufficient to establish prejudice, it is another failure to be considered when weighing the probabilities of prejudice due to counsel's failures.

In conclusion, this court finds that the conduct of petitioner's trial counsel at the sentencing hearing represents ineffective assistance of counsel. Further, this court finds that had counsel adequately prepared for the sentencing hearing, presented this evidence in mitigation, and informed his client of the jury unanimity requirement, there is a reasonable probability that the outcome would have been different. Petitioner has not shown that the outcome *would* have been different, but that is not his burden. He has demonstrated that there is a reasonable probability that the outcome would have been different. His Sixth Amendment right to counsel has been violated and his unconstitutional death sentence cannot be imposed.

### III. Petitioner's Motion to Alter or Amend Judgment

Petitioner filed a timely Motion to Alter or Amend Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure ("Motion to Alter or Amend"). Motions to Alter or Amend Judgment are available to correct factual or legal errors, or to present newly discovered evidence. Petitioner asserts three separate grounds in support of his motion: (1) Petitioner's conviction for deviate sexual assault is based on insufficient evidence; (2) Petitioner's constitutionally infirm testimony had an injurious effect on the outcome of the sentencing hearing; and (3) Petitioner's Vienna Convention rights were violated.[4] Each ground will be addressed in turn.

### A.     Deviate Sexual Assault Conviction

---

[4]Petitioner also presents for the first time a fourth ground for relief in his Motion to Alter or Amend: trial counsel's simultaneous employment with the Secretary of State created a conflict of interest in his representation of Petitioner. The Court will not address this claim, as it has never been presented to the state courts.

Madej was convicted of murder and three counts of felony murder predicated on armed robbery, rape, and deviate sexual assault. People v. Madej (Madej I), 478 N.E.2d 392, 393 (Ill. 1985).[5] He was sentenced to death for murder and all three counts of felony murder. Id. at 394. The defendant was also sentenced to concurrent terms of 30 years imprisonment for armed robbery and rape. Id. at 394. He was not given a separate sentence for his deviate sexual assault conviction; it was only used as a predicate for one count of felony murder. In the Motion to Alter or Amend, Petitioner presses two claims respecting the deviate sexual assault conviction: (1) that the Court mischaracterized results of the DNA analysis and (2) that the Court's decision to deny the claim that his conviction for deviate sexual assault is based on insufficient evidence was incorrect.

1. **Results of the DNA Analysis**

A DNA expert examined tissue and semen samples taken from the victim pursuant to this Court's March 1999 discovery order. See United States ex rel. Madej v. Gilmore, No. 98-C-1866, 1999 WL 182150, at *2 (N.D. Ill. Mar. 24, 1999) ("discovery is granted to petitioner to conduct DNA samples on tissue and semen samples"). Respondent filed the results of the DNA analysis with this Court on January 23, 2002.

Petitioner contends that this Court mischaracterized the results of the DNA test in its original opinion. In the opinion, the Court announced that the DNA analysis "showed that petitioner is the source of sperm found in Barbara Doyle's vagina and rectum." (Slip op. at 20) While this is consistent with the report's conclusion, it overstates the case slightly with respect to

_____

[5]Respondent made the incredible representation that Petitioner was never actually convicted of deviate sexual assault. (Supp. Answer May 2, 2002 at 4). The trial court unambiguously stated that Petitioner was convicted of deviate sexual assault. (Supp. R. Aug. 18, 1982 at 11) Respondent's contention is utterly without merit.

the sperm found in the rectal cavity. The DNA analysis confirms that Petitioner is definitely the source of the sperm found in the victim's vaginal cavity.[6] The report was unable to confirm the source of sperm found in the victim's rectal cavity, though "the genetic traits which were detected from the rectal slide sperm fraction are in agreement with the genetic traits possessed by the sperm source from the vaginal slide." (DNA Supp. Rep. Feb. 12, 2001 at 6) The Court now corrects its original conclusion about the DNA analysis with the following summary of the DNA report: Petitioner is the source of sperm found in Barbara Doyle's vagina, and most likely the source of sperm found in her rectum.

### 2. Sufficiency of Evidence of Deviate Sexual Assault

In order to prevail on a claim of insufficient evidence, the Court reviews "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The essential elements of the crime are drawn from state substantive law. In order to be convicted of deviate sexual assault, the state must have proved that a person compelled any other person, by force or threat of force, to perform or submit to an "act of sexual gratification involving the sex organs of one person and the mouth or anus of another." Ill. Rev. Stat. 1979, ch. 38, par.11-2, 11-3.[7]

---

[6]The report indicates that "approximately one out of 19 trillion" individuals would have the specific array of genotypes found in the vaginal sample. Petitioner's array of genotypes matched the sample perfectly.

[7]The deviate sexual assault statute was repealed in 1984 when the Illinois legislature restructured its criminal sex offenses. See P.A. 83-1067, § 28, eff. July 1, 1984; P.A. 83-1362, Art. II, § 40, eff. Sept. 11, 1984. The repeal of the statute has no effect on the judgment here. For the new statute, including its saving clause, see 720 Ill. Comp. Stat. 5/12-12. For a discussion of the statutory changes, see James P. Carey, The New Illinois Criminal Sexual Assault Statute, 16 Loy. L. J. 757 (1985); Aaron Jaffe & Reynold E. Becker, Four New Basic Sex Offenses: A Fundamental Shift of Emphasis, 72 Ill. B. J. 400 (1984).

Madej contends that the evidence presented at trial was insufficient to prove that he engaged in anal intercourse with the victim. This Court will now revisit the evidence presented at trial that supports the conviction. First, Petitioner's attorney agreed to stipulate that a rectal slide taken from the victim contained sperm. (App. To Resp't. Answer, Vol. II at 323)[8] Outside of the presence of sperm, there was no forensic evidence that Petitioner had anal intercourse with the victim.

In addition to the stipulations about the rectal slide, Petitioner testified about his sexual relations with the victim. His testimony about what exactly took place was unclear. During direct examination of Petitioner the following colloquy took place on the subject of sex:

> Defense Counsel: Are you hesitant about talking about sex?...
> Madej: Yes, sir, I am.
> Defense Counsel: Would – what specifically did you do when you had sex?
> Madej: An act of fornication. That's the only way I know how to put it.
> Defense Counsel: Did you have regular intercourse?
> Madej: No, we did the basics, kiss, hug, and fornication from the rear also.

(App. to Resp't. Answer, Vol. II at 394) Later, during cross-examination, Madej twice reiterated that he had sex with the victim "in the rear." (App. To Resp't Answer, Vol. II at 554–55)[9] When asked directly if he "entered the victim from her anus," Madej responded that he could not recall. (App. to Resp't. Answer, Vol. II at 632) The trial court struck that answer because it felt the

---

[8] The Respondent filed the trial transcript in the second volume of the Appendix to its Answer, wherein its listed as Exhibit A. Volume II of the Appendix only has one exhibit (the trial transcript), so the Court eliminated the exhibit number from the citation.

[9] The entire colloquy on cross-examination was:

| Prosecutor: | ... you had sex again and you said in different positions, what do you mean by different positions by the way? |
| Madej: | In the rear. |
| Prosecutor: | I cannot hear you when you have your hand in front of your mouth. |
| Madej: | In the rear. |

(Trial Record at 554–55).

State's Attorney was using "words that the witness is not familiar with." (App. to Resp't. Answer, Vol. II at 632).

Based on this evidence, the trial court convicted Petitioner of deviate sexual assault. Viewing this evidence "in the light most favorable to the prosecution," it is apparent that there was sufficient evidence presented at trial to convict Petitioner of deviate sexual assault. The forensic evidence taken from the victim, combined with Petitioner's testimony on direct and cross-examination was sufficient to raise a legitimate constitutional inference that he had anal sex with the victim before her death. The evidence of violence done to the victim's body is sufficient to satisfy the statute's "force or threat of force" requirement.

Despite that conclusion, this Court must also take notice of the conclusions the DNA experts reached in this case about the forensic evidence taken from the victim's rectal cavity. After performing microscopic examinations and DNA analysis of the rectal slide, the experts found that "the quantity of spermatozoa on the rectal slide was significantly less than what was found on the vaginal slide." (Docket #104, DNA rep. Jan. 24, 2001 at 3) Continuing, the expert initially noted that this "raises the possibility that spermatozoa are present in the rectal area as a result of vaginal drainage." (Docket #104, DNA rep. Jan. 24, 2001 at 3) In the second report of the DNA experts, wherein they compared the analysis from the victim with samples provided by Petitioner, they could not conclude that the material matched with Petitioner because "the number of cells and the amount of DNA recovered from this sample are *far less* on the rectal slide compared to the vaginal slide." (Docket #104, DNA rep. Feb. 12, 2001 at 6) (emphasis added).

Upon further inquiry, Respondent's own expert concluded that the "most likely explanation" for the rectal slide containing fewer cells is that the "ejaculate ... subsequently

drained from the vagina into the rectum." (Supp. to Am. Pet. dated Apr. 10, 2002 at 17). Respondent rightly points out that this conclusion was not proffered under oath, but that does not change the calculus of its credibility, especially given that it came from Respondent's own expert. In short, the experts concluded that it was unlikely that Madej had anal intercourse with the victim, but they could not rule out the possibility entirely.

It is apparent to this Court that the discovery it granted in March 1999 led to the first careful examination of the swabs taken from the vagina and rectum of the victim. The state forensic lab apparently performed microscopic analysis that revealed the presence of sperm prior to trial (though the laboratory reports were never entered into evidence because counsel stipulated to the finding), but it performed no further analysis of the sample.[10] At Petitioner's trial, the state forensic expert testified that they kept the swabs in a room that was conducive to bacterial growth and contamination.[11]

During the state post-conviction process, Petitioner made several unsuccessful attempts to gain access to this evidence. In 1991 and again in 1993, Madej's post-conviction counsel sought to examine the forensic evidence, but the requests were denied. While this Court believes that the state courts should have been more willing to permit discovery in this case, the evidence Petitioner has marshalled remains insufficient to meet the high standard of proof that claims of insufficient evidence require. While Petitioner's evidence is compelling, it does not cross the necessary threshold to establish that no "rational trier of fact could have found the essential

---

[10]If the state lab did perform further analysis of the sample, the reports from that analysis has never been presented to this Court nor has it been disclosed to the Petitioner.

[11]The state's expert, Ms. Kokocinski, testified, "[The storage facility] is a perfect area for bacteria grow. Therefore, given a certain length of time, a short period of time, bacteria will start to grow on the swabs..." (App. to Resp't Answer, Vol. II at 352)

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

(1979). Consequently, Madej's Motion to Alter or Amend Judgment on this basis is denied.

### B.    Petitioner's Testimony at Sentencing

Petitioner contends that the trial court expressly relied upon his testimony in sentencing

him to death, so it must have had a substantial and injurious effect on the sentence. This Court

has already vacated petitioner's sentence, therefore, this issue in the Motion to Alter or Amend is

moot.

### C.    Vienna Convention

Petitioner claims that he is entitled to a new trial and sentencing hearing because the state

violated his rights under the Vienna Convention on Consular Relations, April 24, 1963, 21

U.S.T. 77, 596 U.N.T.S. 261, and the Consular Convention of 1972 between Poland and the

United States, May 31, 1972, 24 U.S.T. 1231. Both treaties explicitly declare that citizens of a

foreign state should be afforded access to their consulate in the event of their detention on

suspicion of illegal activity. In Petitioner's case, his rights under both treaties were clearly

violated.

In 1998, Petitioner presented his international law claims in a post-conviction petition

pursuant to Section 2-1401 of the Illinois Code of Civil Procedure. See 735 Ill. Comp. Stat. 5/2-

1401. The statute affords petitioners two years from the date that their conviction becomes final

to file a post-conviction petition. Although there was no dispute that his Vienna Convention

rights were violated,[12] the state court concluded Madej's petition was filed 14 years too late.

---

[12]See People v. Madej [Madej III], 739 N.E.2d 423, 430 (Ill. 2000) (McMorrow, J.,
concurring in part & dissenting in part) ("In the case at bar, there is no question that the State failed
to inform defendant, a citizen of Poland, of his right, under article 36(1)(b) of the Vienna
Convention, to contact the Polish consulate at the time of his arrest.")

People v. Madej [Madej III], 739 N.E.2d 423, 426 (Ill. 2000) (dismissing Madej's Vienna Convention claims for failure to comply with two year statute of limitations for Section 2-1401 petitions). Petitioner presses the claim again in this court, asking it to amend its judgment on the basis of the July 2001 International Court of Justice ruling in the LaGrand case. LaGrand Case (Germany v. U.S.), 2001 I.C.J. 104 (June 27) available at http://www.icj-cij.org/icjwww/idocket/igus/igusframe.htm.

In LaGrand, the International Court of Justice found that the United States had violated the rights of two German nationals under the Vienna Convention when the U.S. failed to inform them of their rights of consular access. LaGrand Case (Germany v. U.S.), 2001 I.C.J. 104. The ruling of the International Court of Justice (ICJ) in LaGrand is certainly among the most important developments defining the treaty obligations of signatories to the Vienna Convention.

It has been an open question in the Seventh Circuit whether the Vienna Convention creates individually enforceable rights. See United States v. Lawal, 231 F.3d 1045, 1048 (7th Cir. 2000) ("[W]hile some courts, including ours, have had the opportunity to decide whether Article 36 creates individual rights enforceable in judicial proceedings, all have sidestepped the issue. . . . Likewise, we need not decide the issue today.") (citations omitted). "As a general rule, international treaties ... do not create individual rights that are enforceable by an individual." United States v. Chaparro-Alcantara, 226 F.3d 616, 620–21 (7th Cir. 2000) (citing Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990)). The Seventh Circuit has intimated that Article 36 of the Vienna Convention (the provision at issue here) might mark an exception to the general rule. See Chaparro-Alcantara, 226 F.3d at 621 ("this general rule has exceptions ... and, indeed, [the Supreme Court] has said that section 36 of the Vienna Convention

'arguably confers on an individual the right to consular assistance following arrest,' Breard v.

Greene, 523 U.S. 371, 376 (1998) (per curiam)") (citation omitted).

Petitioner contends that the International Court of Justice foreclosed reliance on a state

procedural rule when a court confronts an alleged Vienna Convention violation. Respondent

replies that the judgment of the Supreme Court in Breard v. Greene, 523 U.S. 371, 375–76

(1998) (per curiam) establishes that procedural default rules do apply to violations of the Vienna

Convention.

This Court agrees with Petitioner, that LaGrand does foreclose strict reliance on

procedural default rules for violations of the Vienna Convention. The International Court of

Justice (I.C.J.) announced that procedural default rules "in [themselves] do[] not violate Article

36 of the Vienna Convention." LaGrand Case (Germany v. U.S.), 2001 I.C.J. 104, at ¶ 90. The

I.C.J. went on to declare:

> procedural default rules [that] prevent[] [courts] from attaching any legal
> significance to the fact [that violations of the Vienna Convention prevent
> consulates from affording legal assistance to foreign nationals] ... ha[ve] the effect
> of preventing 'full effect [from being] given to the purposes for which the rights
> accorded under this article are intended', and thus violate[] paragraph 2 of Article
> 36.

LaGrand Case, 2001 I.C.J. 104, at ¶ 91. The United States voluntarily submitted to the

jurisdiction of the I.C.J. to resolve disputes over the interpretation of the Vienna Convention.

See Vienna Convention on Consular Relations, Optional Protocol Concerning the Compulsory

Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 326 ("Disputes arising out of the interpretation

or application of the [Vienna] Convention shall lie within the compulsory jurisdiction of the

International Court of Justice . . . ."). Consequently, the I.C.J. ruling conclusively determines that

Article 36 of the Vienna Convention creates individually enforceable rights, resolving the

question most American courts (including the Seventh Circuit) have left open. See LaGrand

<u>Case</u>, 2001 I.C.J. 104, at ¶ 77 ("the Court concludes that Article 36, paragraph 1, creates individual rights"). It also suggests that courts cannot rely upon procedural default rules to circumvent a review of Vienna Convention claims on the merits.

Respondent's contention that this claim is foreclosed by <u>Breard</u> does not withstand close scrutiny. The Supreme Court's declaration in <u>Breard</u> that the procedural default rules apply equally to Vienna Convention violations operated on the explicit assumption that "those rules enable full effect to be given to the purposes for which the rights accorded under this Article are intended." <u>Breard v. Greene</u>, 532 U.S. 371, 375 (1998) (per curiam) (quoting Vienna Convention, Article 36 § 2). The I.C.J. has now declared that those rules do interfere with giving full effect to the purposes of the treaty, <u>see</u> <u>LaGrand Case</u>, 2001 I.C.J. 104, at ¶ 91, undermining a major premise of the holding..

Additionally, the precedential authority of <u>Breard</u> was limited to begin with. First, <u>Breard</u> was decided on an accelerated timetable without full briefing and consideration. <u>See</u> <u>Breard</u>, 532 U.S. at 380–81 (Breyer, J., dissenting from denial of stay); <u>id.</u> at 379 (Stevens, J., dissenting from denial of stay) (noting that the Court was "deprived of the normal time for considered deliberation"). Cases decided on accelerated timetables are entitled to less precedential authority. <u>See</u> <u>Hohn v. United States</u>, 524 U.S. 236, 251 (1998) ("[W]e have felt less constrained to follow precedent where . . . the opinion was rendered without full briefing or argument."). Second, it was a <i>per curiam</i> disposition, which are also entitled to less weight. Third, it did not engage directly with the obligations that the Vienna Convention imposes.

The Supreme Court, in <u>Breard</u>, did, however, provide a blueprint for how to consider claimed Vienna Convention obligations. In order to support relief on a Vienna Convention violation, the Petitioner must, at a minimum, make "some showing that the violation had an

effect on the trial." Breard, 532 U.S. at 377. In the I.C.J. consideration of LaGrand, it was immaterial whether the LaGrand's would have received assistance from Germany, see LaGrand Case (Germany v. U.S.), 121 I.C.J. 104, at ¶74, but it is not immaterial for the case at issue here. The I.C.J. governs disputes between nations about the interpretation of the Vienna Convention. This is not a dispute between the Republic of Poland and the United States; this is a petition for a writ of habeas corpus from a state prisoner who is alleging that he is being held "in violation of the Constitution, Laws, or Treaties of the United States." While the I.C.J. interpretation of the interplay between the procedural default doctrine and the Vienna Convention is binding when considering an individual violation, the aspects of their holding that pertain more closely to the issue between nations do not control the dispute before this Court.

To gain relief on a Vienna Convention violation, then, a Petitioner must show a) that his Vienna Convention rights were violated; and b) that the violation had a material effect on the outcome of the trial or sentencing proceeding. In Madej's case, the violation of his rights under the Vienna Convention is clear; the effect of the violation, however, is somewhat muddy. If his rights had been respected, it is unlikely that the assistance of the Polish Consulate would have had a material effect on the outcome of the trial. The evidence of Madej's guilt was substantial. It is possible, though, that the Consulate's participation would have had an effect on the sentencing hearing. "[C]onsular functions are particularly significant during penalty proceedings in which courts determine whether capital punishment will be applied." John Quigley, LaGrand: A Challenge to the U.S. Judiciary, 27 Yale J. Int'l L. 435, 435 (2002). Particularly in this case, where trial counsel failed completely to undertake any investigation of the client's life, character, and background in preparation for the sentencing phase, the participation of the Consulate could possibly have made a difference. As this Court has already granted Petitioner relief from his

death sentence, this issue becomes moot.[13] Petitioner's Motion to Alter or Amend judgment on the Vienna Convention claim is granted, but relief is still denied.

## CONCLUSION

For the reasons given in this opinion, Respondent's Motion to Reconsider the judgment vacating petitioner's death sentence is granted; Petitioner's Motion to Strike Respondent's Reply Brief is denied; and Petitioner's Motion to Alter or Amend Judgment is granted with respect to the facts of the deviate sexual assault conviction and the Vienna Convention issue. This opinion supplements the original opinion, issued March 8, 2002. For the reasons given in this opinion and the original opinion, this Court vacates Petitioner's sentence of death. To the extent that the two opinions differ, the analysis in this opinion supersedes the original. The state of Illinois is ordered to resentence him in a manner that comports with Constitutional requirements within sixty (60) days of the date of this order.

Enter:

David H. Coar

United States District Judge

Dated: September 24, 2002

_____

[13]If the Court did not deem the issue moot, the inquiry would not necessarily end with granting Petitioner relief. Because the issue presents itself on habeas corpus, the Court would have to grapple with the threshold question of retroactivity. Since there is no clear Supreme Court precedent about remedies for Vienna Convention violations, it is unlikely that this, or any other Court could premise relief on this basis.